## McGOVERN v. DAVID KAUFMAN'S SONS CO.

(District Court, E. D. New York. July 8, 1908.)

CONTRACTS—REQUISITES—CONDITIONAL ACCEPTANCE OF OFFER.

Respondents, desiring to bid for the purchase of a large quantity of scrap iron offered for sale by the United States on the Isthmus of Panama to be removed within 30 days, applied to libelant for a proposition to furnish vessels to remove the iron, if purchased, to New York, and libelant replied that his firm had an offer from a steamship company, the terms of which he stated. Respondents acknowledged receipt of the proposal, stated that they had made a bid based thereon, and that "if successful we will be glad to place this business with you." The bid was not accepted because it did not meet the requirement to remove the iron within 30 days, and respondents thereupon modified it in that respect and on its acceptance contracted with another steamship company to do the freighting. *Held*, that they were under no contract obligation to libelant's firm which required them to consult him before changing their bid or to give him an opportunity to change his proposal to conform to the new bid before contracting with another, and were not liable for damages for breach of contract, either to libelant's firm or to the undisclosed steamship company on whose behalf it proposed to contract for the carriage.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, § 96.]

In Admiralty.

Wheeler, Cortis & Haight (Charles S. Haight and John W. Griffin, of counsel), for libelant.

Wallace, Butler & Brown (Howard S. Harrington, of counsel), for respondent.

CHATFIELD, District Judge.   In the month of August, 1906, the United States government offered for sale and removal some 7,000 tons of scrap iron and old machinery, which material was at Cristobal, upon the Isthmus of Panama, and which by the terms of the offer, under date of August 3, 1906, circular No. 322, of the Isthmian Canal Commission, was to be removed within 30 days from date of notice to remove, with right of resale if not so removed.   The circular also stated that the material would be sold as it lay on docks at Cristobal or Colon, within reach of the ship's tackles, and must be removed by the purchaser entirely at his own expense.   Other provisions were included in the circular, which has been placed in evidence, and the respondent proceeded to make a bid for this material.   The proposals were to be opened upon the 31st day of August, 1906, at 10:30 a. m., at the office of the Commission in Washington.   One Alexander Kaufman, a member of respondent's firm, applied to the libelant, Thomas B. McGovern, who was a member of the firm of Sonntag, McGovern & Donnell, about the 29th of August, after a conversation by telephone, to secure ships for bringing the material to Elizabethport, N. J. Mr. McGovern, on the same day, wrote to the respondent that his firm had the following firm offer from a steamship company:

"They will furnish tonnage for the carrying forward of about 7,000/8,000 tons of scrap iron from Colon or Cristobal, Isthmus of Panama, to New York, under the following conditions:  They agree to have steamers in readiness to transport this material from either of the above-mentioned loading berths within 45 days of acceptance of the bid of the successful bidder by the Isthmian Canal Commission, and to move it in lots of from 2,000–4,000 tons, the size of the vessel at their option.  Cargo to be delivered to them within reach of vessel's tackles at loading port as fast as ship can take it in, but not less than 350 tons per day, and to be received at destination as fast as ship can put it out, working both loading and discharging with all hatches.  They agree, if desired by charterers, to discharge the scrap iron onto cars at destination, provided by so doing there is no delay in the dispatch of the ship, and that trimming into cars is not for account of steamer.  Steamer to be free of wharfage at loading and discharging berths.  Rate of freight to be $3.40 per ton of 2,240 lbs.  This bid is made on material covered by Isthmian Canal Commission's circular No. 322, and is made only in the event of the Commission deciding on you as a successful bidder.  We would further say that delivery can be made at Elizabethport, provided there is sufficient water there for the vessels to lie safely at the wharf, and you should stipulate in your bid that wharfage is to be free at Colon or Cristobal.  We understand that the rate of wharfage there is $35 per day, but the government customarily give free wharfage for vessels taking cargoes for them.  We learn the Maryland Steel Company and Joseph's are both bidding on this scrap.  We shall, of course, expect, in the event of your being the successful bidder, that you will place the freighting of this cargo through us."

And upon the 30th of August the respondent replied as follows:

"We are in receipt of your favor of the 29th, in which you express your willingness to transport a tonnage of scrap iron offered for sale by the Isthmian Canal Commission at Colon or Cristobal, Isthmus of Panama, on basis

of $3.40 per gross ton to Elizabethport, N. J., or New York City, provided you obtain free wharfage at both points, based upon 45 days' time in which to commence loading of same from official notice and 30 days' time in which to make removal of the entire tonnage. We have submitted our proposition accordingly, and if successful we will be glad to place this business with you and also take up question as to specific destination. In the meantime we will thank you for the interest and prompt attention manifested and will file your letter for future reference."

After the opening of the bids upon the 31st of August, there is a disagreement in the testimony as to the sequence of events; but it seems to be undisputed that telephonic conversations ensued between Mr. McGovern and the Kaufmans; that Alexander Kaufman, the member of the firm who had started the negotiations, saw Mr. McGovern in New York, and spoke to him about seeing Mr. Ross, the chief purchasing agent of the Commission, at the Hotel Waldorf; that Ex-Governor Voorhees, of New Jersey, as counsel for the respondent, went to Washington, and upon the 6th day of September, 1906, communicated by telephone with the Kaufmans, to the effect that their bid could not be accepted, because of the additional conditions imposed. It should be stated here that the bid of the Kaufmans, as filed on the printed blank, with relation to lot No. 1, lot No. 2, and lot No. 3, stated that "removal will be commenced within 45 days and completed within 75 days," although in the printed proposals, in the same sheet, it was specified, as has been stated, that the material must be removed within 30 days, under penalty. Gov. Voorhees then withdrew all conditions as to the time, the bid of respondent was accepted, it entered into an agreement with the Tweedie Trading Company, which is set forth in the testimony, and the goods were brought to New York upon the Tweedie Trading Company's ships.

It appears from the testimony that, subsequent to the original negotiations with Mr. McGovern and to the filing of the bid, the respondent learned that it would be compelled to pay duty upon any of the iron which might be classified as of foreign manufacture, and the rate of transportation with the Tweedie Trading Company was $1.10 per ton. It also appears from the testimony that the removal, in fact, took 46 days, and that the respondent was compelled to pay a penalty therefor; but the arrangement of the respondent with the Tweedie Trading Company, if successfully carried out, would have accomplished the removal within the specified 30 days. Between the interval of the first telegram from the Kaufmans to McGovern, upon the 29th of August, and the writing of the letter by him, Mr. McGovern procured an offer from the Munson Steamship Line, which offer was the basis of the letter written by Sonntag, McGovern & Donnell, upon August 29th, above set forth. At the same date, between Labor Day and the 6th day of September, 1906, Mr. McGovern and his agent, Mr. Battie, made some inquiry as to the necessity for the conditions contained in the Munson Company's offer, and the Munson Company expressed its willingness and ability to furnish vessels immediately at Colon or Cristobal. Upon the 6th day of September, Mr. McGovern, on behalf of his firm, wrote to the Kaufmans asking for information, and referring to the fact that reports in the press had been noticed by the steamship people to the effect that the respondent

had received the award for the scrap iron, and that instructions as to the movements of steamships was desired. In reply to this letter, the respondent sent the following:

"Replying to your favor of the 6th the deal with the government fell through so far as your proposition was concerned."

Upon the 11th of September the firm of Sonntag, McGovern & Donnell wrote to the respondent to the effect that they considered:

"That the correspondence which passed between us constituted a preliminary contract, the performance of which was dependent, only, upon your bid being accepted by the Panama Canal Commission. The obligation on the part of the steamship company, to supply you with the necessary service at a fixed rate, and your obligation to furnish them with the material to be carried, were mutual. This view of the matter is shared in by the steamship company, who propose to hold you responsible."

The firm of Sonntag, McGovern & Donnell then assigned to Mr. McGovern its cause of action under the alleged breach of contract, which contract is stated in the assignment to have been made on or about the 30th day of August, between the firm of Sonntag, McGovern & Donnell and David Kaufman's Sons Company. The Munson Steamship Line, a corporation, also assigned on the 26th day of November, 1906, its claims and demands against the Kaufman Company, arising out of the breach of contract made on or before the 30th day of August, between the said steamship company and the said Kaufman Company, whereby the said Munson Steamship Line agreed to transport 7,000 to 8,000 tons of scrap iron from the Isthmus of Panama to New York.

So far as the statement of facts above narrated is concerned, it is believed that there is no dispute upon the record. The principal difference of fact arose over the time of the alleged interview between Mr. Kaufman and Mr. McGovern before seeing Mr. Ross, Canal Commissioner, and the details of that interview. The respondent also testified that Mr. McGovern insisted at all of the interviews over the telephone, between the 30th of August and the 6th of September, upon a rigid adherence to the terms of the bids with reference to the 45 days and 30 days, while Mr. McGovern testified that he had communicated to the Kaufmans the information that the steamship company had said that Kaufman's bid was high, that some question had arisen as to the condition of the loading, and that he would see what the steamship company could do about modifying these conditions. It is evident that the information that duty would be collected upon foreign material, and that the Tweedie Trading Company would undertake the contract at about one-third the rate, explains sufficiently the reason why the respondent entered into a contract with the Tweedie Trading Company, rather than with Sonntag, McGovern & Donnell, and the respondent cannot be blamed therefor, if it had the right so to do. It is rather difficult to see how Mr. McGovern could have been in communication with the Kaufmans with reference to a modification of his proposal, prior to the writing of the letter of September 6th, which is above set forth, and from this fact, and inasmuch as it is uncontradicted that Mr. Ross was at the Waldorf upon the 30th of August, the libelant does not seem to have sustained the burden of

proof, in order to show that his assignors communicated to the respondent any modifications of their proposal which they were willing to make, or that any suggestion of modification (if suggested) was accepted.

Considerable argument has been had and some testimony was taken with reference to the rate of loading and the terms of the offer of the Munson Steamship Company, as compared with the contract made with the Tweedie Trading Company; but it seems to be immaterial, for neither the original proposition nor the contract made with the government contained anything except the statement that the material is to be furnished at the dock, and therefore the questions of free wharfage and rate of loading did not interfere with the Tweedie Trading Company contract, nor did it interfere and was not even included in the proposal of the Kaufmans to the government, based on the Munson Line proposition. This takes it out of the power of the respondent to object that the Munson Line proposal was unavailable for these reasons; but, on the other hand, nothing is added thereby to the rights of the libelant, if the Kaufmans were in a position to make a contract with the Tweedie Trading Company with impunity.

The theory upon which the libelant has brought his suit seems to be materially at variance with the understanding of the respondent as to the rights of the libelant's assignors, against which their arguments and testimony are directed. The issue seems to be one of law, rather than of fact, while the witnesses for the respondent have in certain particulars raised issues of fact, and have given testimony to strengthen their positions which is not particularly persuasive, but which nevertheless does not bear upon the question of law involved. The libelant is an assignee. One of his alleged causes of action is for the profits of his firm in the form of commissions on the amount which would have been paid to the steamers carrying the scrap iron. The other cause of action is the damage which the Munson Line is alleged to have sustained because it did not get the contract through the agency of Mr. McGovern's firm. The Munson Line boats are stated to have proceeded to New York in ballast, rather than with the freight of this lot of scrap iron. It is unnecessary at this time to consider the question of damage, or whether the measure of damage would be the prospective amount of freight charges, rather than the actual loss involved in the delay, aside from prospective profits; but it is difficult to perceive upon what theory the Munson Line have any claim which they could assign to Mr. McGovern. If the Munson Line had a binding contract with McGovern's firm, then McGovern's firm would be charging damage because of its obligation to the Munson Line, and it is impossible to see how an undisclosed principal can have a cause of action for breach of contract, when the question at issue is whether the so-called agent of the undisclosed principal had made a binding agreement between another party and himself as principal, which agreement was to be carried out by entering into a second agreement with the person claiming to be the undisclosed principal.

Upon this view of the case, it is apparent that if any cause of action existed it belonged to Mr. McGovern personally, or to his firm, and

arose out of their loss of profits or damage from the act of the respondent, and might be claimed to include the amount of liability or the amount which the firm had been compelled to pay to the Munson Line; but it is apparent from the testimony that nothing has been paid to the Munson Line, nor has the Munson Line claimed any cause of action against Sonntag, McGovern & Donnell, and it is difficult to see, so far as the testimony in this case is concerned, how the Munson Line could have any claim, unless Sonntag, McGovern & Donnell had previously recovered from the respondent some amount in lieu of or representing damages for the delay of the vessels to be used in the proposed work while the matter was in abeyance. The cause of action must therefore be looked at entirely from the standpoint of Sonntag, McGovern & Donnell, and is, in effect, that at the request of the respondent they made certain proposals, to be used by the respondent in bidding, and that a mutual relation existed between the McGovern firm and the respondent with regard to the putting in of the proposed bid, by which mutual relation each party was bound to keep good faith with the other.

The respondent claims that this mutual good faith did not extend to an agreement to report upon the progress of the bid and negotiate further in order to have the bid accepted, if modified, and the respondent denies any conversations or communications subsequent to the original discussions by which it could be held to what would be equivalent to a partnership relation in the putting in of the bid. The libelant, on the other hand, is, in effect, claiming that a contract in the nature of a partnership had been entered into, by which the libelant's firm and the respondent had agreed that respondent should put in a bid to the government, and both parties should endeavor to have the bid accepted, and that both parties should profit in the transaction if any bid were accepted, and this involves upon the libelant's part a denial of the claim that the offer communicated through Mr. McGovern was nothing more than a proposal, which would not ripen into a contract until accepted or rejected by the respondent. The respondent contends that its acceptance or rejection of this proposal was not dependent alone upon its obtaining any contract whatever with the United States. The issue of the case is, in reality, whether the making of any contract with the government was of itself an acceptance of the offer communicated through Mr. McGovern, and bound the respondent to deal with McGovern's firm as partners of the Kaufmans, or as having an interest in the government contract.

This question must turn entirely upon the language of the two letters exchanged upon August 29th and 30th, inasmuch as the libelant does not satisfactorily show any modification of the agreement thereafter. There is nothing in the letter of McGovern's firm to the respondent, under date of August 29th, supra, to indicate more than a proposal, which could be accepted or rejected as the respondent saw fit, until the last clause is reached, which is to the effect that the McGovern firm expect the respondent to place the contract with them, in the event of being a successful bidder, in such language as to imply that the words "on any terms" are to be understood; but, even with these words included, it is difficult to see how the Munson Line would

become party to the arrangement. The acceptance of August 30th was to the effect that a bid had been based upon 45 days to commence and 30 days' time to remove, and stated:

"We have submitted our proposition accordingly, and if successful we will be glad to place this business with you."

It can be readily seen that the contract was what is frequently called "unilateral." Unless withdrawn, the proposition of the McGovern Company could be accepted by the respondent. But it is difficult to see what contract the respondent made with the McGovern Company, other than an agreement to submit the bid, based upon the proposed offer, and, if that bid were successful, that the respondent might accept the offer, and agreed to do so if the offer were kept open. The entire trouble with the case has arisen from the fact that, when it became necessary to shorten the time of operation, it appeared that the price could be cheapened by dealing with the Tweedie Trading Company, and the question of duty upon materials also came in, instead of the prices for freighting rising as the difficulties increased.

The libelant has sued upon his original contract, as modified; but the burden of proof as to the acceptance of a modification by the respondent does not seem to be met. The original contract seems to have been the basis of negotiations until after the refusal to accept the bid offered by the United States government, and while courtesy and fair dealing might have demanded that the respondent communicate with Mr McGovern, and thus give him an opportunity to change his offer, and to compete with the Tweedie Trading Company's bid, there does not seem to have been any legal obligation upon the respondent by which it was bound to accept any offer by Mr. McGovern to enter into another arrangement. If the United States had refused the proposition and called for new bids, no cause of action could have been alleged, and what happened was in effect the making of a new bid by the Kaufmans, at a time when they were under no obligation to Mr. McGovern or the Munson Steamship Company to deal with them further, if the original bid was not accepted. All parties, including the Munson Line, seem to have been indulging in a speculation upon the government proposal, and resultant loss, when the particular speculation failed to turn out favorably, does not of itself prove legal damage for which a fellow speculator can be held responsible.

The libel will be dismissed.